UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/4/14

URSULA NELSON,

        **Plaintiff,**

   - against -

SELFHELP COMMUNITY SERVICES,
INC. and YAIHADDY WILLAN,

        **Defendants.**

------------------------------------------------------- X

<u>OPINION AND ORDER</u>

13-cv-5524 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

      Ursula Nelson is a ninety-three-year-old holocaust survivor, who required a home health care aide ("HHA") "to assist her with daily care activities, to make sure she was safe and her basic needs were met."[1]  Defendant Selfhelp Community Services, Incorporated ("Selfhelp") is a nonprofit corporation that provides HHAs and other services to the elderly and at-risk populations to enable

---

[1]     Plaintiff's Statement Pursuant to Rule 56.1 ("Pl. 56.1") ¶ 3.

them to live independently in their own homes.[2]   Selfhelp, originally founded in

1936 to assist refugees fleeing from Nazi persecution, maintains its Nazi Victim

Services program and offers enhanced case management services, including home

care, to holocaust survivors and other persons.[3]   Since August 2006, Nelson has

been receiving HHA services from Selfhelp.[4]   When Nelson initially retained

Selfhelp's services it was only on a part-time basis.[5]   Beginning in or about January

2011, Nelson required full-time care seven days a week and thereafter Yaihaddy

Willan, a former Selfhelp HHA, moved into Nelson's apartment as her primary

HHA.[6]

      This case involves allegations of physical assault by Willan against

Nelson, and the injuries Nelson suffered as a result, while Willan was employed

with Selfhelp.[7]   On August 8, 2013, Nelson sued both Willan and Selfhelp.  Nelson

---

[2]      *See* 8/15/14 Declaration of Koku Badasu, Selfhelp Director of the
Licensed Home Care Services Agency and the City Home Care Programs, in
Support of Motion for Summary Judgment ("Badasu Decl.") ¶ 2.

[3]      *See id.* ¶ 3.

[4]      *See id.* ¶ 4.

[5]      *See id.*

[6]      *See id.*

[7]      *See* Complaint ("Compl.") ¶ 4.  Willan has not appeared in this action.
On May 29, 2014, Nelson moved for a default judgment against Willan.  On June
26, 2014, Nelson withdrew the motion after discovering that Willan had never been

alleges that on March 23, 2011, she was "assaulted and/or battered by [] Willan, in the course of her duties and employment with [] Selfhelp."[8]  Nelson also sued Selfhelp under theories of negligent retention and supervision of Willan.[9]  Selfhelp now moves for summary judgment.[10]  For the reasons set forth below, the motion is GRANTED.

## II.   BACKGROUND

### A.   Selfhelp's Hiring of Willan

The following facts are undisputed.  On or about April 21, 2009, Willan applied for a position as an HHA with Selfhelp.[11]  Willan listed her former

---

served.  *See* Memorandum of Law on Behalf of Selfhelp Community Services, Inc. In Support of Its Motion for Summary Judgment ("Def. Mem."), at 1.

[8]      Compl. ¶ 22.

[9]      *See id.* ¶ 29.

[10]      On May 21, 2014, during a pre-motion conference, I dismissed all time-barred claims based on the agreement of the parties.  The only remaining claim against Selfhelp is the alleged negligent retention and supervision of Willan. *See* 8/15/14 Declaration of Thomas A. Catalano, counsel to Selfhelp, in Support of Motion for Summary Judgment ("Catalano Decl.") ¶ 2; 5/21/14 Transcript of Pre-Motion Conference, Ex. C to Catalano Decl., at 21.

[11]      *See* Defendant's Statement Pursuant to Rule 56.1 ("Def. 56.1").  *See also* Badasu Decl. ¶ 10; 4/21/09 Selfhelp Employment Application, Ex. I to Catalano Decl., at SH0134.

employer, Empire Marketing, Incorporated ("Empire"), as a reference.[12]  In

response to Selfhelp's employment verification inquiry, Leah Mahadeo, the

President of Empire, provided a reference letter stating that Willan is a "very hard

working and conscientious person."[13]  Christine Debush, a Literacy Specialist of

the Harlem Center for Reading and Writing, also provided a reference letter to

Selfhelp stating that Willan "was a dedicated student and motivated to learn and

progress in English reading and writing."[14]  Vashi Clarke, a reference librarian of

the Bushwick Public Library, wrote in another reference letter that Willan "is easy

to get along with and [she had] no hesitation in recommending [Willan]."[15]

Willan enrolled in the New York State approved Selfhelp Training

Program.[16]  On May 21, 2009, Willan attended pre-orientation.  Training classes

---

[12]    *See* 4/21/09 Selfhelp Employment Application, Ex. I to Catalano
Decl., at SH0135.  *See also* Badasu Decl. ¶ 11.

[13]    Def. 56.1 ¶ 2.  Badasu Decl. ¶ 11; 4/20/09 Letter from Leah Mahadeo,
President of Empire, to Selfhelp, Ex. K to Catalano Decl. ("Mahadeo Ltr."), at
SH0148.

[14]    Def. 56.1 ¶ 3.  Badasu Decl. ¶ 12; Letter from Christine Debush, to
Selfhelp, Ex. L to Catalano Decl. ("Debush Ltr."), at SH0149.

[15]    Def. 56.1 ¶ 4.  Badasu Decl. ¶ 13; Letter from Vashi Clark, to
Selfhelp, Ex. M to Catalano Decl. ("Clark Ltr."), at SH0150.

[16]    *See* Badasu Decl. ¶ 14; 4/21/09 Selfhelp Training Program
Enrollment, Ex. N to Catalano Decl., at SH0166.

were held from May 26, 2009 through June 15, 2009.[17]  On May 20, 2009, a

statewide criminal background check conducted by Selfhelp showed that Willan

did not have a criminal history.[18]  On June 12, 2009, Willan obtained her

Certificate of Completion of the training program and became qualified for

employment as an HHA.[19]  By letter dated August 26, 2009, New York State

Department of Health ("DOH") determined that after conducting a national and

state criminal history record check, Selfhelp was "not required to deny [Willan's]

individual eligibility for employment" pursuant to Public Health Law or Executive

Law.[20]  Willan completed Selfhelp in-service training programs and received

positive performance reviews.[21]  Willan was medically cleared for employment and

---

[17]    *See* Baduso Decl. ¶ 14; 4/21/09 Selfhelp Training Program
Enrollment, Ex. N to Catalano Decl., at SH0166.

[18]    *See* Def. 56.1 ¶ 5. *See also* Baduso Decl. ¶ 15; 5/20/09 Criminal
Statewide Report, Ex. O to Catalano Decl. ("Criminal Rpt."), at SH0213.

[19]    *See* Baduso Decl. ¶ 17; 6/12/09 Certificate of Completion, Ex. Q to
Catalano Decl., at SH0165.

[20]    Def. 56.1 ¶ 6.  Badasu Decl. ¶ 16; 8/26/09 Letter from DOH to
Selfhelp, Ex. P to Catalano Decl. ("DOH Ltr."), at SH0214.  The letter further
states that "[t]his determination does not constitute an opinion or recommendation
by DOH as to whether this individual should be hired for the position for which he
or she has applied."

[21]    *See* Def. 56.1 ¶¶ 8-9. *See also* Badasu Decl. ¶ 18; Selfhelp Employee
In-Service Attendance and Annual Performance Reviews, Ex. R to Catalano Decl.
("Performance Reviews"), at SH0171-SH0208.

kept up-to-date vaccinations.[22]  She was periodically tested for illicit drugs, all of

which returned negative results.[23]  On July 1, 2009, Willan began her employment

with Selfhelp.[24]

C.    **Prior Incidents**[25]

On August 31, 2009, Willan was working as a live-in HHA for a

client.[26]  Willan's relief was two and a half hours late and Willan was required to

stay with the client until her relief person arrived.[27]  While Willan stayed with the

---

[22]      *See* Def. 56.1 ¶ 11. *See also* Baduso Decl. ¶ 20; Medical Documents,
Ex. S to Catalano Decl., at SH0094-SH0116.

[23]      *See* Def. 56.1 ¶ 12. *See also* Baduso Decl. ¶ 20; Medical Documents,
Ex. S to Catalano Decl., at SH0094-SH0116.

[24]      *See* Def. 56.1 ¶ 7. *See also* Badasu Decl. ¶ 6; Employee Notes Print,
Ex. E to Catalano Decl. ("Employee Notes Print"), at SH0036.

[25]      When "an incident or an issue concerning a HHA" arises it is entered
into Selfhelp's computer system on the HHA's Employee Notes Print.  An entry in
the Employee Notes Print may be accompanied by supporting documents such as
Occurrence Reports, Client Notes Print, or disciplinary notices. *See* Badasu Decl.
¶¶ 6-7. "The designation of EMERGENCY SITUATION [in the Employee Notes
Print or Client Notes Print] is one of a limited set of choices from a pull-down
menu in [the] client management computer program." Reply Declaration of Koku
Badasu in Further Support of Selfhelp's Motion for Summary Judgment ("Badasu
Reply Decl.") ¶ 14; Selfhelp Schedule Detail, Ex. U to Catalano Decl.  For
example, it may refer to a "variety of ordinary events," such as "the immediate
need to obtain a replacement HHA." Badasu Reply Decl. ¶ 15.

[26]      *See* Badasu Reply Decl. ¶ 18.

[27]      *See id.*

-6-

client, she failed to remind the client to take her medication and failed to prepare breakfast for the client.[28]  Willan's co-worker and relief person reported to Selfhelp that upon her arrival, the client's morning medication was still in the pill box, the client was not cleaned, and the client's personal care was not attended to.[29]  Willan was called into the Selfhelp office on September 1, 2009.[30]  Selfhelp spoke with Willan regarding the complaint.[31]  Willan admitted to not giving the client personal care and reminding the client about the medication.[32]  Selfhelp noted that this was a "serious violation" but that it did not require a discharge from employment as Willan was a new employee and had only been with Selfhelp for two months.[33]  Willan was reprimanded and issued a written warning stating that Willan "is expected to care for any client that she is assigned to."[34]

---

[28]     *See* Pl. 56.1 ¶ 10.  *See also* Badasu Reply Decl. ¶ 19.  While HHAs are not authorized to administer medication to clients, their roles do include reminding the client to take their medication.  *See id.*

[29]     *See* Employee Notes Print, at SH0035.

[30]     *See id.*

[31]     *See id.*

[32]     *See id.*

[33]     *See* Badasu Reply Decl. ¶¶ 19-20.

[34]     9/1/09 Employee Disciplinary Action Form, Ex. G to Catalano Decl., at SH0211.

On January 24, 2010, a client's daughter called Selfhelp to request that Willan be removed from the client's case.[35] The client's daughter believed that Willan may have taken twenty dollars from an envelope she had given to her mother.[36] She also stated that Willan does not care for her mother properly and did not do any work on the weekend.[37]

On September 18, 2010, at 11:40 a.m., Willan called the Selfhelp answering service.[38] Willan reported that her client had injured her right arm due to a fall while walking to the bathroom.[39] Willan placed a call to 911 and the client

---

[35]    *See* Pl. 56.1 ¶ 9. *See also* Employee Notes Print, at SH0028. *See also* 1/24/10 Occurrence Report, Ex. F to Catalano Decl., at SH417. *See also* Client Notes Print, Ex. F to Catalano Decl. ("Client Notes Print"), at SH419.

[36]    *See* Employee Notes Print, at SH0028. *See* 1/24/10 Occurrence Report, Ex. F to Catalano Decl., at SH417. *See also* Client Notes Print, at SH419.

[37]    *See* Employee Notes Print, at SH0028. *See also* Client Notes Print, at SH423.

[38]    *See* Badasu Reply Decl. ¶ 4; 9/18/10 Occurrence Report, Ex. F to Catalano Decl., at SH421. *See also* Client Notes Print, at SH423.

[39]    *See* Badasu Reply Decl. ¶ 4; 9/18/10 Occurrence Report, Ex. F to Catalano Decl., at SH421. *See also* Client Notes Print, at SH423. The client, born on September 29, 1924, was eighty-five years old at the time of the fall. *See* Badasu Reply Decl. ¶ 7; Client Maintenance and Client Notes Print, Ex. T to Catalano Decl.

was taken to New York Hospital Queens.[40]  Willan accompanied the client to the

emergency room where the client was treated for a dislocated shoulder.[41]  Willan

stayed with the client until the client was discharged at 8:47 p.m. that evening.[42]

Willan called Selfhelp in order for the attending physician to speak with a family

member or the client's nurse.[43]  Koku Badasu, the Director of Selfhelp's Licensed

Home Care Services Agency and the City Home Care Programs, was notified of

the incident and an incident report was completed.[44]  On September 21, 2010, a

social worker from the client's guardianship program called Selfhelp and requested

that Willan be removed from the case "due to the client having 2-3 unusual

occurrences during [Willan's] shift."[45]

     Several other incidents occurred during Willan's employment.  These

---

[40]    *See* Badasu Reply Decl. ¶ 5; 9/18/10 Occurrence Report, Ex. F to
Catalano Decl., at SH421.  *See also* Client Notes Print, at SH423.

[41]    *See* Badasu Reply Decl. ¶¶ 5-6; 9/18/10 Occurrence Report, Ex. F to
Catalano Decl., at SH421.  *See also* Client Notes Print, at SH423.

[42]    *See* Badasu Reply Decl. ¶ 6; Client Notes Print, at SH423.

[43]    *See* Badasu Reply Decl. ¶ 6; Client Notes Print, at SH423.

[44]    *See* Badasu Reply Decl. ¶ 4; 9/18/10 Occurrence Report, Ex. F to
Catalano Decl., at SH421.  *See also* Client Notes Print, at SH423.

[45]    Pl. 56.1 ¶ 7.  *See also* Badasu Reply Decl. ¶ 9; Employee Notes Print,
at SH0016; Client Notes Print, at SH423.  The client continued to receive HHA
services from Selfhelp until February 28, 2012.  *See* Badasu Reply Decl. ¶ 11;
Client Maintenance Notes, Ex. T to Catalano Decl.

include: failing to show up for a case, excessive cancellations, continuously falling asleep while caring for a client, and not cooking a client's food the way she wanted.[46]

### D.    Nelson and Willan

Since moving into Nelson's home in January 2011, Willan served as Nelson's primary HHA.[47]  Willan's duties included shopping, preparing meals, and accompanying Nelson on several visits to see Nelson's primary care physician, Dr. Hyam Setton.[48]  Nelson believed Willan to be "really very efficient."[49]  Dr. Setton was also "quite impressed" with Willan because she "took over more or less" and informed Nelson of this.[50]  Up until the incident, there was never a time when Willan had become "upset or angry" with Nelson, but she had previously conveyed to Nelson that Nelson was a "terrible person."[51]  This comment did not particularly

---

[46]      *See* Employee Notes Print, at SH0010-SH0036.

[47]      *See* Badasu Decl. ¶ 4.

[48]      *See* 4/16/14 Transcript of Deposition of Ursula Nelson, plaintiff ("Tr."), Ex. D to Catalano Decl., at 31-32.

[49]      *Id.* at 31.

[50]      *Id.* at 31-32.

[51]      *Id.* at 35-38.

bother Nelson because she "realized that [Willan] was under some kind of strain."[52] Although Nelson never complained to Selfhelp about Willan, she may have mentioned something to her attorney, Michael Lissner.[53]   Prior to the incident, Nelson did not believe there to be any indication that something was mentally wrong with Willan and Nelson thought the incident was "quite unexpected in a way."[54]

On March 23, 2011, the day of the incident, Nelson woke up at about 9:00 a.m.[55]  Nelson believed Willan was supposed to have arisen at 7:30 a.m. but she was still asleep in her bedroom with the door closed.[56]  When Nelson noticed that Willan had not come out of the bedroom, Nelson entered Willan's bedroom and wakened Willan by lifting up Willan's bedcovers.[57]  Willan got out of the bed and began hitting Nelson on the top of her head with a book or "some hard object."[58]  Nelson "retreated to the living room" where Willan continued to hit her

---

[52]   *Id.* at 71.

[53]   *See id.* at 38.

[54]   *Id.* at 69.

[55]   *See id.* at 43.

[56]   *See id.* at 44.

[57]   *See id.* at 45.

[58]   *See id.* at 45-46.

several times.[59]  Nelson "blacked out" and next recalls Lissner coming to her home

and then receiving medical treatment from Dr. Setton.[60]  The incident caused

Nelson to have "severe personal injuries" and "to be hospitalized."[61]

## III.   STANDARD OF REVIEW

"Summary judgment is appropriate '[w]here the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party.'"[62]

Accordingly, summary judgment is appropriate "only where, construing all the

evidence in the light most favorable to the [non-moving party] and drawing all

reasonable inferences in that party's favor, there is 'no genuine issue as to any

material fact and . . . the movant is entitled to judgment as a matter of law.'"[63]

---

[59]   *See id.* at 50.

[60]   *Id.* at 54-56.  Portions of Willan's deposition testimony conflict with
the medical records.  While Willan recalls Dr. Setton treating her at her home, the
medical records show she was taken to a hospital emergency room.

[61]   Pl. 56.1 ¶ 5.  *See also* 3/24/11 Occurrence Report, Ex. H to Catalano
Decl. at 0073; 3/24/11 Quality Management Department Follow-
up/Investigation/Outcome, Ex. H to Catalano Decl., at 0075.  Supporting
documents concerning the assault by Willan against Nelson are also annexed as
Ex. H and include handwritten notes, report of follow-up visit to the hospital, HHA
notes, correspondence and other emails.

[62]   *Whethers v. Nassau Healthcare Corp.*, No. 13 Civ. 2991, 2014 WL
4637215, at *1 (2d Cir. Sept. 18, 2014) (*citing Matsushita v. Zenith Radio*, 475
U.S. 574, 587 (1986)).

[63]   *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d
Cir. 2014).

## IV.   NEGLIGENT HIRING, RETENTION, AND SUPERVISION

Under New York law, an employer may be found liable for the conduct of its employee under theories of negligent hiring, retention, or supervision.[64] To prevail on such a claim, "'in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or within the employer's chattels.'"[65] "'Summary judgment is appropriate where there is no proof that the employer acted negligently in hiring, training, supervising or retaining an employee.'"[66]

"There is no common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably

---

[64]   *See Hall v. Smathers*, 240 N.Y. 486 (1928).

[65]   *Doe v. City of New York*, No. 09 Civ. 9895, 2013 WL 796014, at *3 (S.D.N.Y. Mar. 4, 2013), *aff'd*, 558 Fed. App'x 75 (2d Cir. 2014) (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations omitted)).

[66]   *Richardson v. City of New York*, No. 11 Civ. 2320, 2013 WL 6476818, at *10 (S.D.N.Y. Dec. 10, 2013) (quoting *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 463-64 (S.D.N.Y. 2012)).

prudent person to investigate the prospective employee."[67] "'A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee.'"[68] "[A] defendant is liable for negligently retaining an employee without any corrective action when the employer knows or should have known that the employee has a propensity – namely prior acts and/or behavior – for the sort of conduct which caused the injury alleged."[69]

## V.    DISCUSSION

Nelson argues that there is overwhelming evidence that during Willan's tenure between May 20, 2009 to March 23, 2011, the date of the incident, "Willan demonstrated, repeatedly, that she lacked the skills, temperament, and

---

[67]    *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 163 (2d Dep't 1997) (citations omitted).

[68]    *Tsesarskaya*, 843 F. Supp. 2d at 464 (quoting *Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010)). *Accord Taylor v. United Parcel Serv., Inc.*, 72 A.D.3d 573, 574 (1st Dep't 2010) (holding that plaintiff failed to present sufficient evidence that defendant had notice of employee's propensity to engage in sexual assault at the time of hire when employee had no criminal record).

[69]    *Doe v. New York City Dept. of Educ.*, 43 Misc. 3d 1221(A), 992 N.Y.S.2d 158 (Sup. Ct. N.Y. Co. 2014) (citing *Ernest L. v. Charlton Sch.*, 30 A.D.3d 649, 650-51 (3d Dep't 2006)).

-14-

capacity to function as an HHA, and in fact, could be a danger or cause harm."[70]

Nelson argues further that because Selfhelp had a "heightened obligation . . . to

monitor the conduct of its HHAs, and be wary and alert of any signs of impending

harm," and breached this obligation, Selfhelp's negligent retention and negligent

supervision was the direct proximate cause of Nelson's injuries and damages.[71]

There is no dispute that Willan and Selfhelp were in an employee-employer

relationship, or that the assault committed upon Nelson at Nelson's home was

within Selfhelp's chattels. The disagreement pertains to whether Willan had a

propensity toward physical assault and whether Selfhelp knew or should have

known of that propensity.

        In connection with Willan's application for an HHA position and

Selfhelp's pre-employment investigation of Willan, Selfhelp received three

favorable reference letters regarding Willan's work ethic and character.[72] Selfhelp

also conducted a criminal background check on Willan which did not reveal any

---

[70]    Memorandum of Law and Affirmation on Behalf of Plaintiff Ursula Nelson in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem."), at 2.

[71]    *Id.* at 3.

[72]    *See* Mahadeo Ltr. *See also* Debush Ltr., Clark Ltr.

-15-

criminal history.[73] Willan was cleared by the New York State Department of Health.[74] Additionally, Willan attended Selfhelp's in-service training program and received positive performance reviews before being hired in July 2009.[75] There is no evidence of any misconduct in Willan's prior employment or background that would lead Selfhelp to investigate further. While Nelson cites Willan's lack of experience as an HHA prior to being employed with Selfhelp, this evidence does not give rise to the contention that Selfhelp had notice or should have had notice of Willan's inclination to engage in physical assault prior to hiring her.

Moreover, the unrelated complaints noted in Willan's Employee Notes Print establish neither actual nor constructive knowledge that Willan had a propensity toward physical assault. "[T]he plaintiff must prove that the employer defendant was or should have been aware of the *specific* conduct at issue."[76]

---

[73]    *See* Criminal Rpt.

[74]    *See* DOH Ltr.

[75]    *See* Performance Reviews at SH0171.

[76]    *Doe v. Montefiore Med. Ctr.*, No. 12 Civ. 686, 2013 WL 624688, at *4 (S.D.N.Y. Feb. 19, 2013) (citations omitted) (holding that despite evidence of employee's "aggressiveness, unpredictability, delusional paranoia, and possible need of mental health intervention," there was no indication to the employer that employee was ever physically violent or had a propensity toward sexual misconduct). *See also Soba v. New York City Housing Auth.*, No. 11 Civ. 7430, 2013 WL 3455449, at *8 (S.D.N.Y. Jul. 9, 2013) (holding that evidence of the individual defendant's prior instances of misconduct did not demonstrate his

-16-

Selfhelp produced voluminous records including Employee Notes Prints, Client

Notes Prints, Occurrence Reports, correspondence, and emails. While the noted

prior instances may support the contention that Willan was frequently tardy,

forgetful, or unreliable, none of the complaints allege or suggest physical assault.[77]

Although Nelson contends that the incident involving a client falling and

dislocating her shoulder while in the care of Willan is enough to indicate a prior

assault, this is mere speculation.[78] Additionally, Willan had only one disciplinary

violation, for which Selfhelp took corrective action by reprimanding her and

---

propensity to commit sexual assault); *Kovalchik v. City of New York*, No. 09 Civ. 4546, 2014 U.S. Dist. LEXIS 132178, at *26 (S.D.N.Y. Sept. 18, 2014) (granting summary judgment where there was no evidence to suggest that City was aware of inappropriate conduct prior to the instance at issue).

[77]     Several of the cases on which Nelson relies are inapposite. The supporting evidence in those cases was either sparse, or there was evidence that the employer had knowledge of the employee's propensity to commit the *same* type of wrongful act that gave rise to the action. *See, e.g., Haight v. NYU Langone Med. Ctr., Inc.*, No. 13 Civ. 4993, 2014 WL 2933190 (S.D.N.Y. June 27, 2014) (holding there were material issues of fact about employee's wrongdoings and when employer acquired the information); *Polito v. Tri-Wire Eng'g Solution, Inc.*, 699 F. Supp. 2d 480 (E.D.N.Y. 2010) (despite the sparse record there was evidence of prior harassment giving employer notice of the same alleged conduct at issue); *Lopez v. New York City Dept. of Educ.*, 43 Misc. 3d 1204(A), 990 N.Y.S.2d 438 (Sup. Ct. N.Y. Co. 2014) (summary judgment denied where defendants had notice that employee had engaged in sexual misconduct on at least one previous instance and did nothing); *Weinberg v. Mendelow*, 113 A.D.3d 485 (1st Dep't 2014); *Alleva v. United Parcel Serv., Inc.*, 112 A.D.3d 543 (1st Dep't 2013).

[78]     *See* Pl. Mem. at 27.

-17-

stressing the importance of feeding and reminding the clients to take their medication.[79]

Accordingly, Nelson has failed to provide sufficient evidence from which a reasonable juror could infer that Selfhelp knew or should have known of Willan's violent disposition.  Therefore, Selfhelp is entitled to summary judgment on the negligent retention and negligent supervision claims.

## VI.   CONCLUSION

For the foregoing reasons, Selfhelp's motion for summary judgment is GRANTED.  The Clerk of the Court is directed to close this motion [Dkt. No. 36] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 4, 2014

---

[79]      *See* 9/1/09 Employee Disciplinary Action Form, Ex. G to Catalano Decl., at SH0211.

## - Appearances -

**For Plaintiff:**

Peter D. Baron, Esq.
Baron & Pagliughi
200 Old Country Road
Suite 200
Mineola, NY 11501
(516) 742-2600

**For Defendants:**

Thomas Anthony Catalano, Esq.
Lester, Schwab, Katz and Dwyer LLP
100 Wall Street
New York, NY 10005
(212) 964-6611